FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 FEB 14  AM 7: 36

LORETTA G. WHYTE
CLERK

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

CONNIE COSTANZA                                    CIVIL ACTION

VERSUS                                             NO. 05-0177

JO ANNE B. BARNHART                                SECTION "K" (3)
COMMISSIONER OF
SOCIAL SECURITY

## REPORT AND RECOMMENDATION

Plaintiff Connie Costanza brings this action under 42 U.S.C. § 405(g) challenging a final

decision of Defendant Commissioner denying her application for Social Security disability

benefits.  Both parties have filed summary judgment motions which have been referred for a

Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Considering the record, the

memoranda of the parties and the applicable law, **IT IS RECOMMENDED** that Plaintiff's

Motion for Summary Judgment be GRANTED, the Commissioner's decision be REVERSED

and the case be REMANDED for further consideration not inconsistent with the report.

## PROCEDURAL HISTORY

On April 2, 2003, Plaintiff filed an application for Social Security Income benefits

alleging that, due to a hip defect, she cannot walk and became disabled on April 2, 2003.[1]

Plaintiff's application for benefits was denied;[2] thereafter, plaintiff requested a hearing before an

_____

[1]*See* Application for Supplemental Security Income dated April 2, 2002 [Adm. Rec. 54-58]; Disability Report dated April 26, 2002 [Adm.Rec. 77].

[2]*See* Disability Determination and Transmittal dated August 6, 2002 (regarding osteoarthrosis/allied disorders) [Adm. Rec. 26]; Disability Determination and Transmittal dated

1

____ Fee_____
____ Process_____
_X_ Dktd_____
____ CtRmDep_____
____ Doc. No _____

Administrative Law Judge.[3]  On April 3, 2004, Administrative Law Judge (ALJ) Dean Metry conducted a hearing in New Orleans, Louisiana.[4]  Plaintiff, represented by attorney Adrienne LaCour, testified.[5]  Vocational Expert (VE) Edward Ryan also testified.[6]  ALJ Metry found that plaintiff was not disabled because (1) her "severe" impairments (*i.e.*, left hip degenerative joint disease, hypertension, congestive heart failure and chronic obstructive pulmonary disease) do not meet or equal any of the listed  impairments, (2) her allegations regarding her pain and limitations were not credible, and (3) plaintiff was functionally capable of performing sedentary work which exists in significant numbers in the economy.[7]  On December 16, 2004, the Appeals Council denied review.[8]  Plaintiff filed for judicial review of the final decision on January 25, 2005.[9]  The parties filed cross-motions for summary judgement and the matter is now ripe for determination.[10]

---

August 22, 2003 (regarding other and unspecified arthropathies and hypertension) [Rec. Doc. No. 27-35]

[3]*See* Request for Hearing by Administrative Law Judge dated October 7, 2003 [Adm. Rec. 36].

[4]*See* Transcript of June 3, 2004 Hearing before ALJ Metry [Adm. Rec. 207-236].

[5]*Id.*

[6]*Id.*

[7]*See* Decision of ALJ Dean Metry dated July 8, 2004 [Adm. Rec. 19-24].

[8]*See* Notice of Appeals Council Action dated December 16, 2004 [Adm. Rec. 5-8].

[9]*See* Complaint filed January 25, 2005 [Fed. Rec. Doc. No. 1].

[10]*See* Plaintiff's Motion for Summary Judgment [Fed. Rec. Doc. No. 9]; Defendant's Cross-Motion for Summary Judgment [Fed. Rec. Doc. No.12].

## BACKGROUND FACTS

Costanza was forty-five years old when the ALJ issued his decision.[11]  Plaintiff finished

the eighth grade and has no work experience.[12]  She alleges that she became disabled due to

advanced degenerative arthropathy, superior subluxation of the deformed femoral head with leg

length discrepancy, hypertension and unbearable pain increased by walking, standing and sitting

with knees bent.[13]

### A. Plaintiff's Testimony

Plaintiff testified that she is five feet four inches  tall and weighed 200-204 pounds.[14]

Costanza reported that she is right handed and lives with her husband, who was hurt on his job,

and her mentally handicapped nineteen year old son, Corey.[15]  She further testified that she has

never worked outside of the home because her family [two mentally retarded sons][16] is a job in

---

[11]*See* ALJ's Decision dated July 8, 2004 [Adm. Rec. 19]; Hearing Transcript at p. 7 (noting plaintiff  was born on April 22, 1959) [Adm. Rec. 213].

[12]*See* Transcript of Hearing [Adm. Rec. 214].

[13]*See* Transcript of Hearing (describing incredible hip pain and close to a dozen different surgeries on her left hip) [Adm. Rec. 218]; Disability Report dated April 26, 2002 [Adm. Rec. 77]; Report of Dr. Mary Mathai dated June 23, 2003 [Adm. Rec. 165]; Report of Contact dated August 22, 2003 [Adm. Rec. 147]; Pain Report at Section 5 [Adm. Rec.  118]; Work History Report at Section 4 (noting her inability to work due to congenital hip defect) [Adm. Rec. 133].

[14]Transcript of Hearing [Adm. Rec. 213].

[15]*Id.* [Adm. Rec. 213-215].

[16]*See id.* (explaining that her twenty-six year old son Matthew is severely retarded and requires constant supervision, when he returns home from the Metropolitan Developmental Center every other weekend and nineteen year old Corey is moderately retarded and home all of the time) [Adm. Rec. 221, 228].

3

itself.[17]

Addressing her physical limitations, plaintiff testified that no position is comfortable for any more than ten minutes and that she is constantly shifting, to wit: "Up, down, up down."[18] Costanza testified that she has to sit to do the cooking/dishwashing and that cleaning the house takes her all day; on some days, chores (sweeping/mopping) do not get accomplished depending on the severity of her leg pain.[19]

Plaintiff testified that, when she cannot walk, stand, sit or lie down at all, she goes to Charity's emergency room because she has no money and no insurance.  She submits that she cannot have another hip replacement surgery because she cannot afford it and her responsibilities at home have made a lengthy hospital stay an impossibility.  In this vein, Costanza reported that her treating physician, Dr. Sudderth, charges $65.00 for a visit.  However, plaintiff indicated that now that her children are older, she hopes to get the surgery done.[20]  Costanza further testified that she was told she has gout and, when it flares up (approximately twice a month), her joints (ankle, knee and hip) get swollen and painful.  When she has gout, she cannot walk at all.[21]

More specifically addressing her congenital birth defect in the left hip, plaintiff testified that her left hip joint is dislocated and that there is no left hip socket to support the leg bone.  As

---

[17]*Id.* [Adm. Rec. 214].

[18]*Id.* [Adm. Rec. 219].

[19]Transcript of Hearing [Adm. Rec. 220].

[20]*Id.* [Adm. Rec. 222].

[21]*Id.* [Adm. Rec. 223-224].

4

a consequence, her knee is rotating inward and her left leg is distorted (*i.e.*, shaped like a "K").[22]
Because her left leg is so bad and has been left untreated, her right side is affected.[23]  Dr.
Sudderth has prescribed Hydrocodone for her hip pain.  Plaintiff testified that her right leg is
approximately 4 cm longer than the left and that condition has also persisted since birth.[24]

As to the diagnoses of hypertension and congestive heart failure, Costanza testified that
these conditions cause her to experience shortness of breath.  Additionally, plaintiff suffers from
emphysema, secondary to smoking four packs of cigarettes a day.  As to smoking cessation, she
reported that she had cut back to two packs a day.[25]  Costanza testified that Dr. Sudderth has
prescribed Xanax to treat her anxiety disorder and it relaxes her so that she can deal with
situations better.[26]

### B. Medical Evidence

The plaintiff's assignments of error include that, contrary to the applicable regulations,
the ALJ  (1) selectively reviewed the medical record (picking and choosing only those reports
and in some cases only the portions of the reports that supported his determination), (2) failed to
give appropriate weight to either the treating physician's assessment of her medical condition and

---

[22]*Id.* [Adm. Rec. 225].

[23]Transcript of Hearing [Adm. Rec. 226, 229].

[24]*Id.* [Adm. Rec. 226].  *See also* Report of Consultative Examiner Dr. Mathai (noting that
plaintiff's left leg measured 4 cm shorter than the right, the bottom part of plaintiff's left leg was
turning outward, and that a physical examination revealed decreased range of motion in the left
hip, valgus deformity of the knees, crepitus of the right knee, inability to heel/toe walk and an
antalgic gait on the left) [Adm. Rec. 165-167].

[25]*Id.* [Adm. Rec. 227].

[26]*Id.*

5

consultative examining specialist's statements and (3) failed to explain his refusal to accord the

medical opinion of Dr. Sudderth "controlling weight." This Court's review of the medical

evidence of record reveals that the plaintiff's arguments have merit.

In September, 2001, Dr. E. Ward Sudderth examined plaintiff who complained of hip

pain. Dr. Sudderth's treatment notes indicate that the pain was worse in the left hip and left

lower extremity. Physical examination further revealed  rales[27] and wheezing sounds in the chest

cavity. He prescribed Vicodin for pain and Xanax.[28]

On June 11, 2002,  plaintiff  arrived at the Emergency Department of the Medical Center

of Louisiana in New Orleans (MCOLNO) with a chief complaint of left hip pain worsening with

increase in activity.[29]   Observations included that plaintiff was ambulatory, but with a limp.[30]

Physical examination notes revealed decreased range of motion in the left hip with palpable

deformity. Radiologic findings and diagnoses reported consisted of flattening of the left femoral

head and degenerative narrowing and sclerosis of the acetabulum,  most likely attributable to

developmental dysplasia.  Sclerosis of the right S1 joint was also diagnosed as most likely due to

---

[27]"Rale" is defined as an abnormal sound arising within the lungs or air passages and heard on auscultation over the chest; generally characterized by terms such coarse, medium, fine, moist or dry. *See Blakiston's* Gould Medical Dictionary, at p. 1152 (4th Ed.).

[28]*See* Clinic Notes of Dr. E. Ward Sudderth dated September 5, 2001 [Adm. Rec. 152-153].

[29]MCOLNO Emergency Department Triage Record dated June 11, 2002 [Adm. Rec. 156].

[30]*Id.*

preferential use of the right hip.[31]

On June 19, 2003, at the request of Disability Determination Services, plaintiff was examined and evaluated by Dr. Mary Mathai, a Board Certified Physical Medicine and Rehabilitation Specialist.  Dr. Mathai opined:

> LOWER EXTREMITIES: Patient shows full range of motion and muscle strength in her knees and ankles.  Hip range of motion on the right is 100 degrees, extension to full and abduction full, and on the left flexion is 80 degrees, extension to 0 degrees and extension is to 0 degrees actively.  Multiple scars of surgery are noted on the left hip.  Knees have 15 degrees valgus[32] bilaterally. There is crepitus at the right knee.  She has a fungal infection in her nails. Extensor Digitorum Brevis and Extensor Hallucis are normal.  There is no pitting edema of the legs.  Dorsalis pedis and posterior tibial pulses are intact.  Sitting straight leg raising is not full on the left.  Circumferential measurements of thighs and calves are smaller on the left by 2.5 cm and 1 cm, respectively.  She can't walk on heels or toes.  She can squat.  Her left knee goes into valgus of more than 20 degrees with ambulation.  Leg length is shorter on the left by 4 cm.
> * * *
> X-RAYS:  X-ray of the left hip shows advanced degenerative arthropathy and superior subluxation of the deformed femoral head relative to the shallow acetabulum.  Spurring and subchondral cyst formation is identified.  There is a triangular bony density superior to the joint. ...
> REVIEW OF MEDICAL RECORDS:  Left hip X-ray on 6-11-02 showed flattening of the left femoral head with degenerative narrowing and sclerosis of the acetabulum.  The right S1 join is sclerotic.  Left knee X-ray on 5-12-03 showed suggestion of osteopenia and suggestion of effusion.
> IMPRESSIONS:
> 1) Left hip pain with advanced degenerative arthropathy and superior subluxation of the deformed femoral head with leg length discrepancy.
> 2) Hypertension and congestive heart failure on medication.
> 3) Emphysema per history.
> 4) Obesity.

---

[31]MCOLNO Emergency Department Physician's Report and Sign Out Sheet dated June 11, 2002 (noting "no heavy lifting, use crutches, no heavy physical activity" and prescription pain medication "Celebrex as needed") [Adm. Rec. 157-158]; Final Radiology Imaging Report dated June 11, 2002 [Adm. Rec. 159].

[32]"Valgus" is defined as "[L. bent outward], usually indicating an abnormal turning away from the midline of the body."  *Blakiston's* Gould Medical Dictionary, at p. 1441 (4th Ed.).

7

In my opinion, patient is not a candidate for any kind of work needing prolonged standing, walking, carrying, lifting, pulling and pushing. Hearing and speaking are normal. She does not use any assistive device for ambulation but may use one to decrease weight bearing to the left lower extremity. She has multiple medical problems. *She is not a candidate for any kind of work.* She is a candidate for total hip replacement.[33]

A physical assessment form completed on July 3, 2003 by another state medical

consultant reports:

The claimant stated that she cannot walk very long or far or stand for a long period of time and is always in pain. The congenital abnormalities of the hips can be related to the above allegations. *The claimant is fully credible.*[34]

On August 19, 2003, plaintiff was evaluated by consultative examiner, Dr. Miljana

Mandich. She reported a visible limp and visible signs of valgus deformity of the left knee.

Examination of the lower extremities showed a shorter left upper leg by about 1-1/2 inches and a

surgical scar along the side of the left hip. Plaintiff experienced pain in the left hip with straight

leg raising and pain in the hips precluded squatting more than one third of the way down.

Additionally, marked decreased range of motion in the left hip was observed. Dr. Mandich

further noted:

Neurological: The patient's left mid thigh measures about 1-1/2 inch less in circumference that the right side and the distal thigh measures 1 inch less in circumference than the right side. Her calves are equal. She has 1+ symmetrical deep tendon reflexes and her gait is affected by the shorter left leg and also by a

---

[33]Dr. Mary Mathai's Report dated June 23, 2003 [Adm. Rec. 165-168]; *Compare* ALJ Metry's decision (which reports only part of Dr. Mathai's opinion and completely omits, without any explanation, the aforesaid Board Certified Rehabilitation Specialist's opinion that Costanza is not a candidate for *any kind of work* and no reference to her findings of spurring, sclerotic S1 joint on the right, suggestion of osteopenia/effusion as to the left knee and that the patient was a candidate for total hip replacement) [Adm. Rec. 20-21].

[34]Physical Assessment Form dated July 3, 2003 (italicized emphasis added) [Adm. Rec. 174].

valgus deformity of the left knee which is visible when she is standing up while her left foot tends to turn outward.[35]

Because Costanza was evaluated by a physical medicine and rehabilitation specialist (Dr. Mathai) in June of 2003, Dr. Mandich's summary focused mainly on the patient's other medical problems. Accordingly, Dr. Mandich diagnoses were:

1.  Hypertension, under treatment for about eighteen years and well controlled with medication at this time. There is no history of any complications or end organ damage such as congestive heart failure.
2.  Renal insufficiency or vascular incident.
3.  Low back pains, pains in hips and knees suggestive of degenerative joint disease. The patient has a congenital defect of the left hip, had several surgeries on the left hip around the age of 6 and now has shorter left upper leg with mild muscle atrophy, very decreased range of motion of the left him and mild valgus deformity of the left knee.[36]

Between February 5, 2003 and March 30, 2004, claimant was treated for pain in the hips, knees and lower back. The diagnoses were chronic left hip and knee pain, degenerative joint disease, decreased range of motion due to congenital defect, hypertension and chronic obstructive pulmonary disease. Dr. Sudderth consistently prescribed Vicodin for pain, as well as Xanax and Halcion.[37] Additionally, on March 2, 2004, Dr. Sudderth executed a form analyzing the severity of the plaintiff's degenerative joint condition/left hip deformity, *inter alia.* Dr. Sudderth noted that Costanza suffers from a major dysfunction of a joint, characterized by gross anatomical

---

[35]Report of Dr. Miljana Mandich dated August 19, 2003 [Adm. Rec. 181-182].

[36]Report of Dr. Miljana Mandich dated August 19, 2003 [Adm. Rec. 181]. *Compare* ALJ Metry's Decision dated July 8, 2004 (reporting "normal appearance and range of motion in *in all joints and no visible abnormalities of bones and muscles*" but omitting any reference to Dr. Mandich's findings of a shorter left upper leg with mild muscle atrophy, very decreased range of motion of the left hip and mild valgus deformity of the left knee) [Adm. Rec. 21].

[37]*See* Clinic Notes of Dr. E. Ward Sudderth [Adm. Rec. 188-200].

deformity (*e.g.* subluxation), chronic pain and stiffness with signs of limitation of motion and other abnormal motion of the affected joints. These findings were based upon appropriate and medically acceptable imaging of joint space narrowing, bony destruction and/or ankylosis of the affected joints.[38]  Dr. Sudderth further indicated that plaintiff's condition is expected to last in excess of twelve months and results in the patient's inability to ambulate effectively (*i.e.*, the impairments interfere very seriously with her ability to independently initiate, sustain and complete activities).[39]  These findings were checked off by Dr. Sudderth on a form, which is filed in the record together with his treatment records regarding the plaintiff.

## C. ALJ's FINDINGS

The ALJ found that the plaintiff's left hip degenerative joint disease, hypertension, congestive heart failure and chronic obstructive pulmonary disease are considered "severe" within the meaning of the Regulations, but not severe enough to meet or medically equal one of the listed impairments. Both plaintiff's treating physician (Dr. Sudderth) and the State's consulting/examining rehabilitation specialist (Dr. Mathai) opined that the plaintiff was completely disabled, *i.e.*, incapable of performing any kind of remunerative work on a sustained basis. As previously noted, the ALJ omitted any mention of Dr. Mathai's opinion that Costanza was not able to perform any kind of work, *inter alia*.

As to Dr. Sudderth's opinion, the ALJ's failure to accord the treating physician's *medical* opinion controlling weight is not explained at all other than in vague terms discussing the regulations generally. Regarding the plaintiff's residual functional capacity and limitations the

---

[38]*See* Dr. E. Ward Sudderth's Opinion dated March 2, 2004 [Adm. Rec. 188-189].

[39]*Id.*

ALJ explained:

> Claimant's assertions relative to symptomatology, pain and functional limitations
> and restrictions on activities of daily living have been considered in light of the
> factors set forth in 20 C.F.R. 416, 929 and SSR 96-7p, are exaggerated, are found
> to lack corroboration or substantiation in the medical evidence, are inconsistent or
> contradictory as evidenced by the medical record and testimony, are a result of
> lack of significant medication or treatment regimen, and are not credited.

The ALJ concluded without specific reference to any particular listing that Constanza's

impairments are not 'severe' enough to meet or medically equal, either singly or in combination,

one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.

Regarding the plaintiff's allegations of pain and physical limitations, the ALJ made the

following findings, to wit:

> Claimant's assertions relative to symptomatology, pain, functional limitations and
> restrictions on activities of daily living have been considered in light of hte factors
> set forth in 20 CFR 416.929 and SSR 96-7p [and] are exaggerated, are found *to
> lack corroboration or substantiation in the medical evidence, are inconsistent or
> contradictory as evidenced by the medical record and testimony, are a result of
> lack of significant medication or treatment regimen, and are not credited.*

> The claimant is not seeking intense medical treatment nor is she on a significant
> medication regimen. She is able to handle her activities of daily living and
> personal hygiene. She is able to drive and shop. She has had many surgeries over
> the years, but ha[s] not held a job outside of the home because she has two
> mentally handicapped children at home [that] she cares for. While she may take
> longer to get chores done because she has to change positions or may get out of
> breath occasionally, she is able to run her household and care for two handicapped
> children.[40] Claimant's allegations are not supported to the extent alleged.[41]

The ALJ concluded that the plaintiff was not disabled and was capable of performing

certain sedentary work as a cashier, telemarketer and assembler. The ALJ placed further

-------

[40]It is noteworthy that plaintiff testified that

[41]ALJ Metry's July 8, 2004 Decision [Adm. Rec. 22].

11

limitations on the plaintiff's ability to function, including sitting/standing at will, no climbing (ladders, ropes or scaffolds), no working at heights, and only occasional balancing, climbing stairs/ramps, stooping, crouching, kneeling and crawling.[42]   The ALJ also concluded that the plaintiff "has no exertional limitations."[43]

## STANDARD OF REVIEW

The function of the court on judicial review of a denial of benefits is to determine whether "substantial evidence" supports the final decision and whether the Commissioner used the proper legal standards to evaluate the evidence.[44]   If the Commissioner's findings are supported by substantial evidence, they must be affirmed.[45]   "Substantial evidence" is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.[46]   A district court may not try the issues *de novo*, re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if the district judge believes that the evidence weighs against the Commissioner's decision.[47] Nevertheless, the Court must carefully scrutinize the entire record to determine whether

---

[42]*Id.* [Adm. Rec. 23-24].

[43]*See* ALJ's Decision at Finding No. 11 [Adm. Rec. 24].

[44]42 U.S.C. § 405(g); *Newton v. Apfel,* 209 F.3d 448, 452 (5th Cir. 2000); *Brown v. Apfel,* 192 F.3d 492, 496 (5th Cir. 1999).

[45]*Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir. 2002); *Martinez v. Chater,* 64 F.3d 172, 173 (5th Cir. 1995).

[46]*Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001); *Newton,* 209 F.3d at 452.

[47]*Masterson,* 309 F.3d at 272; *Newton,* 209 F.3d at 452.

12

substantial evidence exists to support the ALJ's findings.[48]  Nevertheless, "conflicts in the evidence are for the Commissioner and not for the courts to resolve."[49]

　　If proper principles of law were applied, and if the Commissioner's decision is supported by substantial evidence, the findings are conclusive and must be affirmed.[50]

### Eligibility for Disability Benefits

　　To qualify for Social Security income or disability insurance benefits, the plaintiff must meet the requirements set forth in the Social Security Act.[51]  Specifically, the plaintiff must be under age 65, file an application for benefits and be under a disability as defined by the Act.[52]  Those claiming disability insurance benefits under the Act have the burden of showing the existence of disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months."[53]  Establishment of "disability" is a dual process.  First, the claimant must prove that she suffers from a medically determinable impairment.[54]  Second, the claimant must prove that her impairment or combination of impairments render her unable to engage either in the work she

---

[48]*Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied,* 514 U.S. 1120 (1995); *Anthony v. Sullivan,* 954 F.2d 289, 295 (5th Cir. 1992).

[49]*Masterson,* 309 F.3d at 272 (citations and internal alterations omitted).

[50]*See id.* (*citing Richardson,* 402 U.S. at 401)

[51]*See* 42 U.S.C. § 423(a) (2001).

[52]*See* 42 U.S.C. §§ 416(I), 423(a) (2001).

[53]42 U.S.C. § 423(d)(1)(A) (2001).

[54]42 U.S.C. §§ 416(I)(1), 423(d)(1)(A) (2001).

13

previously performed or other substantial gainful employment that exists in the national

economy.[55]

The Commissioner utilizes a five-step sequential evaluation to aid in the determination of

whether a claimant is disabled.[56]  A finding that the claimant is not disabled at any step is

conclusive and ends the inquiry.[57]  The five-step analysis was cogently restated in *Shave v. Apfel*:

> First, the claimant must not be presently working at any substantial gainful
> activity. Second,  the claimant must have an impairment or combination of
> impairments that are severe.  An impairment or combination of impairments is
> "severe" if it "significantly limits [a claimant's] physical or mental ability to do
> basic work activities."  Third, the claimant's impairment must meet or equal an
> impairment listed in the appendix to the regulations.  Fourth, the impairment must
> prevent the claimant from returning to his past relevant work.  Fifth, the
> impairment must prevent the claimant doing any relevant work, considering the
> claimant's residual functional capacity, age, education, and past work experience.
> At steps one through four, the burden of proof rests upon the claimant to show he
> is disabled.  If the claimant acquits this responsibility, at step five the burden
> shifts to the Commissioner to show that there is other gainful employment the
> claimant is capable of performing in spite of his existing impairments.  If the
> Commissioner meets this burden, the claimant must then prove he in fact cannot
> perform the alternate work.[58]

In conjunction with steps four and five, the Commissioner utilizes a "residual functional

capacity (RFC) assessment to determine whether the applicant, notwithstanding severe

impairment, has the physical and mental ability to perform work-related activities on a regular

---

[55]42 U.S.C. §§ 416(I)(1), 423(d)(2) (2001).

[56]*Newton,* 209 F.3d at 453 (5th Cir. 2000).

[57]*Watson,* 309 F.3d at 272; *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

[58]*Shave v. Apfel*, 238 F.3d 592, 593 (5th Cir. 2001).

14

and continuing basis as is generally required by competitive, remunerative work.[59]   Thereafter,

the Commissioner determines if the claimant has the physical and mental ability to perform her

past relevant work.[60]   If the claimant's RFC meets or exceeds the requirements of her regular

previous employment, the disability claim is denied.[61]   If not, the inquiry proceeds to step 5

where the Commissioner has the burden to show that the claimant can do work as it is generally

performed in the national economy.[62]

**Treating Source's Statements and Determinations**

Ordinarily, the opinions, diagnoses and medical evidence of a treating physician who is

familiar with the claimant's injuries, treatment and responses should be accorded considerable or

great weight in determining disability.[63]   The ALJ may assign less weight to a treating physician's

opinion when there is good cause shown to the contrary.  "A treating physician's opinion on the

nature and severity of a patient's impairment will be given controlling weight if it is well

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with other substantial evidence."[64]   The opinion of a specialist is generally accorded

---

[59]RFC is defined as "what you can still do despite your limitations" and has three components, to wit: physical abilities, mental abilities, and other abilities affected by impairments.  20 C.F.R. § 404.1545(a) (2002); Soc. Sec. Ruling 96-8p, 61 F.R. 34474 (July 2, 1996).

[60]See Chaparro v. Bowen, 815 F.2d 1008, 1010 (5th Cir. 1987).

[61]See 20 C.F.R. § 404.1561 (2002).

[62]See 20 C.F.R. § 404.1566 (2002).

[63]See Loza v. Apfel, 219 F.3d 378, 395 (5th Cir. 2000); Newton, 209 F.3d at 455.

[64]Newton, 209 F.3d at 455 (citations and inner alterations omitted and emphasis added).

15

greater weight than a non-specialist.[65]

The ALJ is not at liberty to reject a medical opinion without giving an explanation and is not at liberty to make a medical judgment regarding the ability or the disability of a claimant to engage in gainful activity where such inference is not warranted by clinical findings.[66] Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status.[67] Treating physicians' opinions are not conclusive regarding matters reserved to the Commissioner.[68] Good cause may permit the ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by clinical findings or is otherwise unsupported by the evidence.[69]

Fifth Circuit law and Social Security Regulations require that the SSA give good reasons for discounting the medical opinion of a treating physician and, in so doing, give specific consideration to the following factors: (1) length of treatment; (2) frequency of examination; (3) nature and extent of treatment; (4) support of the physician's opinion afforded by the medical evidence; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician.[70] "Additionally, SSR 96-5p provides, with respect to Residual

---

[65]*Id. (citing Paul v. Shalala,* 29 F.3d 208 211 (5th Cir. 1994).

[66]*Loza,* 219 F.3d at 395.

[67]*Newton,* 209 F.3d at 456.

[68]*Id. (citing Brown,* 192 F.3d at 500).

[69]*Id.*

[70]*See* 20 C.F.R. § 404.1527(d)(2).

16

Functional Capacity Assessments and Medical Source Statements, that Adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. § 404.1527, providing appropriate explanations for accepting or rejecting such opinions."[71]

## POINTS OF ALLEGED ERROR

Plaintiff contends that, because the ALJ erred by failing to conduct a proper Listing analysis, failing to consider evidence submitted by plaintiff's treating physician and failing to comply with relevant legal standards, the Commissioner's decision should be reversed. The Commissioner submits that Dr. Sudderth's opinion that plaintiff meets Listing 1.02(A)'s requirements is not entitled to controlling weight and that it is erroneous because substantial evidence supports the ALJ's determination that the plaintiff ambulates effectively. The Commissioner urges the Court to affirm its decision and to dismiss the plaintiff's case with prejudice.

## ANALYSIS

Plaintiff argues first that the ALJ's conclusion that he did not meet Listing 1.02(A) at Step Three of his analysis was without basis and incomplete. She maintains that her testimony and the medical evidence demonstrate that she has met the aforesaid listing's requirements and that Dr. Sudderth's medical records speak not only to Listing 1.02, but also to the plaintiff's credibility and her overall medical condition. Moreover, plaintiff submits that the listing assessment completed by Dr. Sudderth finds support in his treatment records and other medical records, findings and opinions, which the ALJ ignored altogether or selectively reviewed.

---

[71]*Newton*, 209 F.3d at 456 (citations, inner quotation marks and ellipses omitted).

The pertinent portion of 20 C.F.R. Part 220, Appendix 1, § 1.02(A) states as follows:

"Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity

(e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and

stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and

findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction,

or ankylosis of the affected joint(s). With: (A) Involvement of one major peripheral

weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as

defined in 1.00B2b[.]" *Id.*

> Listing 1.00B2b(2 ) provides:
>
> To ambulate effectively, individuals must be capable of sustaining a reasonable
> walking pace over a sufficient distance to be able to carry out activities of daily
> living. *Individuals must have the ability to travel without companion assistance to
> and from a place of employment....* **Examples of ineffective ambulation include**
> ... the inability to walk without the use of a walker, two crutches or two canes, *the
> inability to walk a block at a reasonable pace on rough or uneven surfaces, the
> inability to use standard public transportation*, the inability to carry out routine
> ambulatory activities, such as shopping and banking, and the inability to climb a
> few steps at a reasonable pace with the use of a single hand rail.... *Id.* (emphasis
> added).

Aside from the Listing 1.00B2b requirement of ambulating ineffectively, it cannot be

seriously disputed that the plaintiff meets all of the other prerequisites necessary for a finding of

disability under Listing 1.02(A).  First, more than two physicians confirmed that she suffered

from a severe congenital hip defect (advanced degenerative joint disease) with chronic joint pain

and stiffness. Second, objective findings confirmed the  diagnosis and the medical conclusions

were well-supported by clinical evidence including medically acceptable diagnostic imaging.

However, plaintiff's own admissions and medical records confirm that she did not "ambulate

ineffectively", as defined in part by 1.00B2b, insofar as it requires that a claimant demonstrate the need for a hand-held assistive device that requires the use of both hands such as a walker, or crutches, for a period of twelve months or longer.

In this regard, plaintiff's medical history (MCOLNO record) indicates that, at some point in her treatment, her hip pain obliged her to use either crutches or a wheelchair. However, plaintiff testified and the medical records also state plaintiff ambulated effectively with a cane and even without the use of any assistive device at times. Plaintiff did in fact appear at the hearing with a cane as opposed to crutches or a wheechair. Plaintiff's temporary need for assistive devices requiring the use of both hands has not established "inability to engage in any substantial gainful activity" for twelve months or more.

Nevertheless, under Listing 1.00B2b, the inability to ambulate effectively also includes "the inability to walk a block at a reasonable pace on rough or uneven surfaces." 20 C.F.R. Appendix 1 § 1.00B2b(2 ). Clearly the plaintiff, a candidate for total hip replacement,[72] is somewhat limited in that regard. The ALJ did not discuss that example of "ineffective ambulation" set forth in the Regulations. The ALJ did not discuss the plaintiff's ability to travel without companion assistance to and from a place of employment  or whether she was capable of using standard public transportation. The Court here notes that it is undisputed in the medical evidence that, in addition to left hip pain with *advanced* degenerative arthropathy and superior subluxation of the deformed femoral head,  plaintiff had a 1½ inch leg length discrepancy, ambulated with a visible limp and had visible signs of valgus deformity of the left knee. By all

---

[72]*See* Dr. Mary Mathai's Report dated June 23, 2003 [Adm. Rec. 165-168]; Report of Dr. Miljana Mandich dated August 19, 2003 [Adm. Rec. 181-182].

accounts, a frontal view of plaintiff's left lower extremities, approximated the shape of the letter "K". Considering the foregoing, the ALJ should inquire as to whether the plaintiff is capable of walking a block at a reasonable pace on rough or uneven surfaces.

The ALJ committed legal error by failing to follow the regulations in the following respects, to wit: (1) selectively reviewing the plaintiff's medical evidence as noted herein above, (2) failing to specifically address listing 1.02A's requirements in light of the *all* of the objective clinical/medical evidence presented; and (3) rejecting clinical findings and opinions of plaintiff's treating physician (Dr. E. Ward Sudderth) and a consultative medical examiner (Dr. Mary Mathai) without any explanation whatsoever.

The Social Security regulations and rulings provide guidance for the ALJ in determining a claimant's RFC.[73] Specifically, the regulations provide that RFC is "an assessment based upon all of the relevant evidence."[74] In addition SSR 96-8p provides that the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure the file contains sufficient evidence to assess the RFC."[75] The RFC assessment must always consider and address *all* medical source opinions. SSR 96-8p states that an ALJ's assessment of claimant's RFC must contain a "thorough discussion of the objective medical evidence," as well as discuss how, "any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."[76] Social Security Ruling 96-8p provides that

---

[73]*See* 20 C.F.R. §§ 404.1545, § 416.945; and SSR 96-8p.

[74]20 C.F.R. § 404.1545(d).

[75]SSR 96-8p.

[76]*Id.*

residual functional capacity is an assessment of an individual's ability to do sustained
work-related physical and mental activities in a work setting on a regular and continuing basis.
A "regular and continuing basis " means 8 hours a day, for 5 days a week, or an equivalent work
schedule. "The RFC assessment is a function-by- function assessment based upon all of the
relevant evidence of an individual's ability to do work-related activities."[77] Therefore, inherent in
every residual functional capacity assessment is a finding that the claimant can perform work on
a regular and continuing basis, and thus can maintain employment.[78] The Fifth Circuit considers
these regulations and rulings to be relevant to any decision.[79]

The Fifth Circuit's decision in *Watson* required the ALJ to make a finding as to the
claimant's ability to maintain a job for a significant period of time, notwithstanding the
exertional, as opposed to non-exertional (*e.g.*, mental illness) nature of the claimant's alleged
disability. The rule of *Watson*, necessitating a separate finding of whether the claimant is
capable of maintaining employment, is implicated in a situation in which, by its nature, the
claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms.[80]

---

[77]*Id.* (*quoting* 61 Fed.Reg. 34474-01 (July 2, 1996)).

[78]*See* 20 C.F.R. S 404.1545(b); *see also Dunbar v. Barnhart*, 223 F. Supp. 2d 795, 802
(W. D. Tex.2002).

[79]*See Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir.2001); *Watson v. Barnhart*, 288 F.3d
212, 218 (5th Cir. 2002) (holding that the ALJ erred in failing to determine whether Watson was
capable not only of obtaining employment, but also maintaining it).

[80]*See Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002); *Frank v. Barnhart*, 326 F.3d 618
(5th Cir. 2003) (noting, on petition for rehearing, that usually the issue of whether the claimant
can maintain employment for a significant period of time is subsumed in the analysis regarding
the claimant's ability to obtain employment but recognizing, nevertheless, that an occasion may
arise, as in *Watson*, where the medical impairment, and the symptoms thereof, are of such a
nature that separate consideration of whether the claimant is capable of maintaining employment

21

The regulations also require that the ALJ consider the "type, dosage, effectiveness, and side effects of any medication" that the claimant takes or has taken to alleviate pain or other symptoms."[81]   The ALJ's failure to consider or discuss the effect, if any, of continuing drug therapy (*i.e.*, Vicodin, Xanax and Halcion) on the plaintiff's employability constitutes error.[82]

Curiously, the ALJ concluded that the "claimant has *no* exertional limitations."[83]  The applicable regulations define "exertional" and "non-exertional" limitations as follows, to wit:

> **(b) Exertional limitations**. When the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect only your ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling), we consider that you have only exertional limitations. When your impairment(s) and related symptoms only impose exertional limitations and your specific vocational profile is listed in a rule contained in Appendix 2 of this subpart, we will directly apply that rule to decide whether you are disabled.
> **(c) Non-exertional limitations.**
> (1) When the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect only your ability to meet the demands of jobs other than the strength demands, we consider that you have only nonexertional limitations or restrictions. Some examples of nonexertional limitations or restrictions include the following:
> (i) You have difficulty functioning because you are nervous, anxious, or depressed;
> (ii) You have difficulty maintaining attention or concentrating;
> (iii) You have difficulty understanding or remembering detailed instructions;
> (iv) You have difficulty in seeing or hearing;
> (v) You have difficulty tolerating some physical feature(s) of certain work settings, e.g., you cannot tolerate dust or fumes; or
> (vi) You have difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching.

---

is required).

[81]20 C.F.R. S 404.1529(c)(3)(iv); *see also Crowley v. Apfel*, 197 F.3d 194 (5th Cir. 1999).

[82]*See Crowley*, 197 F.3d at 199.

[83]Decision of ALJ Metry dated July 8, 2004 (italicized emphasis added) [Adm. Rec. 24].

(2) If your impairment(s) and related symptoms, such as pain, only affect your ability to perform the nonexertional aspects of work-related activities, the rules in appendix 2 do not direct factual conclusions of disabled or not disabled. The determination as to whether disability exists will be based on the principles in the appropriate sections of the regulations, giving consideration to the rules for specific case situations in appendix 2.

(d) **Combined exertional and nonexertional limitations**. When the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength and demands of jobs other than the strength demands, we consider that you have a combination of exertional and nonexertional limitations or restrictions. **If your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength and demands of jobs other than the strength demands, we will not directly apply the rules in appendix 2 <u>unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations;</u>** otherwise the rules provide a framework to guide our decision.[84]

Contrary to the ALJ's conclusion, it is clear that the plaintiff has *both* exertional and non-exertional limitations.  As to exertional impairments, the ALJ included the limitation of alternating between sitting and standing at will.  Albeit not explained, presumably this limitation was made necessary because of the fact that the plaintiff could not either sit or stand for any appreciable length of time due to pain associated with advanced degenerative joint disease which affected her left hip and her knees.  Non-exertional limitations assigned by the ALJ included certain postural limitations and no working at heights, *inter alia*.  Plaintiff's inability/difficulty in walking any appreciable distance apparently resulted in the limitation to no more than sedentary level work.

Considering the selective reading of the medical evidence, the ALJ may also need to revisit his reasons for discounting the plaintiff's allegations regarding the severity of her pain and other physical limitations.  As a general rule, courts cede enormous latitude and deference to the

---

[84]20 C.F.R.  § 404.1569a (all emphasis added).

ALJ's credibility determinations. The SSA regulations and Fifth Circuit precedent require objective medical evidence showing an underlying medical condition which could produce the type of pain alleged.[85]   It is beyond peradventure that such evidence is of record in the present case. There is a wealth of clinical medical evidence tending to suggest that plaintiff's underlying degenerative joint condition/deformity is extremely severe,[86] so much so that it could reasonably be expected to produce the alleged disabling pain which requires prescription drug therapy (Vicodin/Hydrocodone) on an ongoing basis.[87]

For all of the forgoing reasons, it is this Court's opinion that the Commissioner's decision is not supported by evidence relevant and sufficient for a reasonable mind to accept as adequate support for the conclusion. The ALJ failed to comply with applicable regulations discussed above. A substantiality of evidence evaluation does not permit a selective reading of the medical evidence of record.   The RFC assessment must always consider and address *all* medical source opinions and contain a thorough discussion of the objective medical evidence, as well as discuss

---

[85]*See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir.1994) (noting that, as to a determination of whether the plaintiff's pain is disabling, the first consideration is whether the objective medical evidence shows the existence of an impairment which could reasonably be expected to induce the pain alleged and that medical factors which indicate disabling pain include limitation of range of motion, muscle atrophy, strength deficits, sensory deficits, reflex deficits, etc.).

[86]*See* Report of Rehabilitation Specialist Dr. Mary Mathai dated June 23, 2003 (noting that "left hip pain with *advanced* degenerative arthropathy....," plaintiff "is not a candidate for any kind of work," and that "[s]he is a candidate for total hip replacement") [Adm. Rec. 167]; MCOLNO Records dated June 11, 2002 (noting the results of X-ray showed "*severe* degenerative joint disease in the left hip with subluxation," prescribing Celebrex for pain, and instructing plaintiff to use crutches") [Adm. Rec. 157]; Radiology Report dated June 19, 2003 (noting "advanced deformity and advanced degenerative arthropathy....") [Adm. Rec. 168].

[87]*See* Prescriptions for Vicodin, Xanax and Halcion dated February 5, 2003, September 9, 2003, March 2, 2004, March 30, 2004  [Adm. Rec. 191, 193, 195, 199].

how "any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."[88]

The Court remains mindful that the Commissioner has the exclusive prerogative to weigh evidence and resolve conflicts and further acknowledges that judicial review is both highly deferential to the Commissioner and limited in scope. The Court does not purport to direct a particular ultimate outcome upon remand. Therefore, upon remand, the Commissioner will be free to re-examine all issues.

<h2 style="text-align:center">RECOMMENDATION</h2>

Based upon the foregoing discussion of the issues, evidence and the law, and because plaintiff's points of error should be sustained,

**IT IS RECOMMENDED** that the plaintiff's motion for summary judgment be GRANTED, the defendant's motion for summary judgment be DENIED, the Commissioner's decision be REVERSED and the case be REMANDED for further proceedings consistent with this report and findings.

<h2 style="text-align:center">OBJECTIONS</h2>

Pursuant to 28 U.S.C. § 636(b)(1), any party has the right to serve and file written objections to the Report and Recommendation within 10 days after being served with a copy of this document. The filing of objections is necessary to obtain de novo review by the United States District Court. A party's failure to file written objections within 10 days shall bar such party, except upon grounds of plain error or manifest injustice, from attacking on appeal the factual findings and legal conclusions adopted by the District Court. *Thomas v. Arn*, 474 U.S.

---

[88] *Id.*

25

140 (1985); *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir.1996) (*en banc*).

New Orleans, Louisiana, this 12th day of February, 2006.

DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE

26